UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 15-0133-01 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| DION PAUL BARNES<br>a/k/a DOUGLAS M BARNES<br>a/k/a CHRISTOPHER SINGLETON<br>a/k/a TERRELL RIOS<br>a/k/a MYRON BROOKS | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 84] filed by defendant, Dion Paul Barnes. Following a delay for briefing and a February 16, 2016, evidentiary hearing, the matter is now before the court. For reasons stated below, it is recommended that the motion be DENIED.

### Facts

Three witnesses testified at the hearing – Lt. John Peters, Trooper Harvey Bonner and Investigator Jerry Spencer. In addition, the government introduced nine exhibits that the court accepted into evidence without objection.

The court summarizes the relevant testimony and evidence, all of which was undisputed, as follows:

1. On June 10, 2015, Louisiana State Trooper Harvey Bonner made a traffic stop on Highway 2 Westbound in Ouachita Parish, LA. Trooper Bonner is a Master Trooper with Louisiana State Police with nineteen years of experience. Trooper Bonner was on a routine patrol on his Louisiana State Police motorcycle when he got behind a white Chevrolet Camaro with an Illinois temporary tag. Trooper Bonner attempted to radio dispatch to run the Illinois temporary tag through their computer databases to determine if

       the tag was current. Before Trooper Bonner could run the tag, the white Camaro began to accelerate to a high rate of speed. Trooper Bonner's motorcycle is not equipped with radar, however, he was able to pace the car using his speedometer at approximately 90-95 MPH in the 45 MPH zone on Hwy 2.

2. Trooper Bonner stopped the white Chevrolet Camaro containing driver Barnes and passengers April Augustine and Barbra Island for speeding. Trooper Bonner made contact with Barnes, told him the reason for the stop, and asked for his license and registration. Barnes stated that he thought he was going about 70 to 75 miles per hour, and that he did not realize he was in a 45 mile per hour speed zone. Barnes handed Trooper Bonner a Florida driver's license with the name Douglas Barnes. At this point, Trooper Bonner noticed that Barnes had a lanyard ID around his neck with the name "Terrelle Rios." Trooper Bonner asked him if he was Terrelle Rios. Barnes responded that Terrelle Rios was his brother who had died earlier that year, and he wore the nametag in remembrance of his deceased brother. When Trooper Bonner ran Barnes' driver's license, the results were returned as "not on file." Trooper Bonner determined that the license was counterfeit based on improper placement of the magnetic strip on the back of the card and the fact that the city name "Miami Gardens, FL" was misspelled "Miami Gargens, FL." Eventually, after having arrested defendant under the name of Douglas Barnes, and by running checks in various states under the defendant's date of birth, race, and name, Bonner found a record of an Arkansas license for the defendant in the name of Dion Paul Barnes.

3. Trooper Bonner contacted dispatch to run the driver's license and Illinois temporary tag number. The temporary tag number search came back to a 1990 Chevrolet Cavalier, which obviously did not match the 2015 Chevrolet Camaro driven by Barnes. Defendant claimed that he had purchased the vehicle in Chicago in February of 2015, but was unable to find the registration in the glove compartment.  Barnes also searched in the trunk of the vehicle in a black duffle bag, but was still unable to provide Trooper Bonner with the vehicle's registration or with any proof of ownership.

4. Trooper Bonner testified that he then took the VIN number off of the vehicle's dashboard windshield and also off the door panel, noting that the two numbers matched. Trooper Bonner had dispatch run the VIN number through their search database. The results of the search came back to a vehicle stolen out of Milwaukee, WI, from Enterprise Car Rental.

5. Once he realized that the car was stolen, Trooper Bonner placed Barnes under arrest and read him his rights. Trooper Bonner searched Barnes and recovered $1300 in cash and a Waffle House paycheck in Barnes' left rear pocket made out to Maria Turner. Department of Public Safety Officer Steve Prine arrived on the scene and assisted Trooper Bonner by running the identifications of the two female passengers. Both female passengers were allowed to leave the scene after it was determined neither of the passengers had any outstanding warrants.

6. At this point, Trooper Bonner had the Camaro towed to Troop F. Trooper Bonner conducted an inventory of the vehicle with the assistance of Officer Prine and Investigator Jerry Spencer from the Louisiana State Police Bureau of Investigations. Trooper Bonner conducted the inventory in accordance with Louisiana State Police policy and completed a vehicle storage report. Trooper Bonner did not take any photographs of the interior of the vehicle as required for the storage of seized vehicles; however, the vehicle in question was not being seized or forfeited; it was being held only long enough for its rightful owner to retrieve it.

7. Upon a search of the vehicle, Trooper Bonner uncovered a suitcase, duffle bag and numerous loose items. Trooper Barnes found and seized a large stack of blank check stock paper from a large duffel bag in the vehicle's trunk. He also recovered six cell phones, two laptop computers, notebooks and three computer tablets along with an HP Deskjet 2542 Print/Scan/Copy machine.

8. In another bag, Trooper Bonner found a large number of payroll checks from Waffle House, Dollar General and McDonalds. He also recovered name plates and men's shirts with business logos from Waffle House, Dollar General, McDonalds and several other businesses. The name plates from those businesses were found with either the name "Chris" or "Chris Singleton," and the shirts were all in very large sizes–2XL or 3XL or larger, consistent with the defendant's own size.

## Analysis

**I.    The Stop and Detention**

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop entails a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupants constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *Brigham, supra*. (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit

a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances — the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

The *Terry* standard a is two-tiered inquiry: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (citing *Terry*, 392 U.S. at 19-20). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

    a)    <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is

4

about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

To the extent that Defendant challenges the propriety of the initial stop, his claim is without merit. Trooper Bonner testified that he paced the vehicle operated by Defendant Barnes speeding at approximately 90 MPH in a 45 MPH zone. Barnes also admitted to Trooper Bonner during the traffic stop that he had been traveling in excess of the 45 MPH zone. The undersigned thus concludes that the traffic stop was justified at its inception.

    b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 F.3d at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions.[1] *See generally*

---

[1] "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry*'s second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431.

*Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437.

In this case, Trooper Bonner's routine questions and checks during the valid traffic stop resulted in a finding that the defendant was using a fraudulent driver's license and was driving a stolen vehicle. His continued detention was valid; and his arrest was based on probable cause developed during that detention.

**II.     Standing**

Barnes alleges that the search of the vehicle and its contents violated his Fourth Amendment right against unreasonable search and seizure, and that the Government cannot prove that any exception to the requirement for a warrant applies, so the evidence recovered during the search should be suppressed.

In *United States v. Vega*, the Fifth Circuit explained the burden that a criminal defendant levying a Fourth Amendment challenge faces in the context of standing:

> Whether couched as an issue of standing or the existence of a protected interest, the gravamen of the government's position is that neither appellant enjoyed a subjective expectation of privacy in the premises that society is prepared to recognize as reasonable and, therefore, the government's intrusion was not a "search." The defendants bear the burden of establishing such an expectation by a preponderance of the evidence.

*United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000) *abrogated on other grounds by Kentucky v. King*, 131 S. Ct. 1849 (2011). Barnes thus bears the burden of establishing that he had a reasonable and legitimate expectation of privacy in the vehicle that was searched. *See also United States v. Johnson*, 2008 WL 3876550 at *2 (5th Cir. Aug. 21, 2008) (unpublished opinion) ("'[I]n order to claim the protection of the Fourth Amendment, a defendant must

6

demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . .'").

A person's status as an operator of an automobile does not *per se* confer Fourth Amendment standing. *United States v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988). A defendant must show possession was gained from the owner or from someone who had authority to grant permission for him to use the vehicle. *Id.* The Fifth Circuit specifically held in *United States v. Lanford* that possessors of stolen automobiles lack a legitimate expectation of privacy in the vehicle, and therefore lack standing to challenge a search of the automobile. *Lanford*, 838 F.2d at 1353. Barnes, as the possessor of a stolen vehicle, had no legitimate expectation of privacy in the vehicle. His challenge to the search fails on this ground alone.

In addition, it should be noted that, even if Barnes did have standing to challenge the search, which he does not, the inventory search of the vehicle, following the discovery that the vehicle was stolen and the proper and legitimate arrest of the defendant, was a valid exception to the warrant requirement and in no way violated Barnes' rights. Therefore, even if there were standing, the defendant's motion should be denied.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 84] filed by defendant, Dion Paul Barnes be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within

7

**fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 17th day of February 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE